**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Scott Marshall</u>

     **v.**

<u>Carolyn Colvin,</u>
<u>Acting Commissioner,</u>
<u>Social Security Administration</u>

Civil No. 13-cv-363-PB
Opinion No. 2014 DNH 180

<u>**MEMORANDUM AND ORDER**</u>

Scott Marshall seeks judicial review of a ruling by the Commissioner of the Social Security Administration ("SSA") denying his application for Disability Insurance Benefits ("DIB").  Marshall claims that the Administrative Law Judge ("ALJ") erred in failing to fully consider all of the evidence. For the following reasons, I affirm the Commissioner's decision.

## I.  <u>BACKGROUND</u>[1]

### A.  <u>Procedural History</u>

Marshall applied for DIB on May 25, 2011, claiming that he became disabled on April 1, 2009 due to nerve damage, brain damage, post-concussion syndrome, and depression.  Tr. at 198.

---

[1] The background facts summarized here are presented in the parties' Joint Statement of Material Facts.  Doc. No. 16.  I also rely on the Administrative Transcript, Doc. No. 9, citations to which are indicated by "Tr.".

The SSA denied Marshall's claim on November 3, 2011.  Marshall then requested a hearing before an ALJ, which was held on January 30, 2013.  Marshall was represented by an attorney and a vocational expert ("VE") testified.  On April 19, 2013, the ALJ issued a decision finding that Marshall was not disabled.  The Appeals Council denied Marshall's request for review, making the ALJ's decision the final decision of the Commissioner.

**B.    Relevant Medical History**

　　1.   Early Treatment for Orthopedic Impairments

In 1998, Marshall underwent surgery to treat a disc herniation[2] impinging on a nerve root.  He then began experiencing chronic back pain that has continued to the present.  Marshall began treatment in 1993 for chronic bilateral knee pain leading to multiple knee operations that have provided limited pain relief.  In 1997, diagnostic imaging indicated degenerative disc disease of the cervical spine.

　　2.   Dr. Marino

Dr. Anthony R. Marino, an orthopedist, began treating Marshall for his degenerative disc disease and recurrent disc herniation in 1999.  That year Marshall underwent a revision

---

[2] Disc herniation is the "extension of disc material . . . into the spinal canal."  Stedman's Medical Dictionary 881 (28th ed. 2006).

discectomy with hemilaminectomy and foraminotomy.[3]  The following

year Dr. Marino diagnosed Marshall with symptomatic left elbow

ulnar neuritis and lateral epicondylitis following a left arm

acromioplasty and electromyogram.[4]  In 2000, Marshall reinjured

his right shoulder in a fall following a prior successful

shoulder surgery.  Dr. Marino diagnosed right shoulder

tendonitis after an MRI revealed that Marshall's rotator cuff

was intact.  In February 2001, Dr. Marino diagnosed Marshall

with right shoulder bursitis and possible biceps tenosynovitis

after an MRI revealed glenohumeral joint effusion.[5]  Marshall

---

[3] A discectomy is the "[e]xcision, in part or whole, of an
invertebral disk." Id. at 550.  A hemilaminectomy is the
"[r]emoval of a portion of a vertebral lamina, usually performed
for exploration of, access to, or decompression of the
intraspinal contents." Id. at 866.  A foraminotomy is an
"operation on an aperture, usually to open it, e.g., surgical
enlargement of the intervertebral foramen." Id. at 759.

[4] Ulnar neuritis is the "[i]nflammation of a nerve" relating to
the ulna, the "medial and larger of the two bones of the
forearm." Id. at 1308, 2063.  Lateral epicondylitis is the
"[i]nflammation of" a "projection from" the humerus, the "bone
of the arm[] articulating with the scapula above and the radius
and ulna below," "situated at the lateral side of the distal end
of the bone." Id. at 653, 906.  An acromioplasty is the
"surgical reshaping of" the "lateral extension of the spine of
the scapula that . . . articulates with the clavicle and gives
attachment to part of the deltoid muscles" and is "frequently
performed to remedy compression . . . of the rotator cuff of the
shoulder joint . . . ." Id. at 19.  An electromyogram is a
"graphic representation of the electric currents associated with
muscular action." Id. at 622.

[5] Bursitis is the "[i]nflammation of a" bursa, a "closed sac or
envelope lined with synovial membrane and containing synovial
fluid, usually found or formed in areas subject to friction . .

underwent a right shoulder arthroscopy, release of the biceps
tendon, and bursal debridement soon thereafter, but his right
shoulder pain persisted.[6]  Dr. Marino reported that Marshall had
a permanent right shoulder impairment in November 2002.

### 3. Dr. Sadowsky

Marshall sought mental health treatment from a
psychotherapist from 1991 to 2003.  He was prescribed Zoloft and
Paxil during this period.[7]  Tr. at 507.  In October 2002,
Marshall's primary care physician ("PCP"), Dr. Robert Quirbach,
began prescribing a series of psychotropic drugs to Marshall,
including Zyprexa, Serzone, Celexa, BuSpar, and Ativan.[8]

---

. ."  Id. at 280, 282.  Tenosynovitis is the "[i]nflammation of
a tendon and its enveloping sheath."  Id. at 1946.  Glenohumeral
joint effusion is "increased fluid in [a] synovial cavity of"
"the articular depression of the scapula entering into the
formation of the shoulder joint."  Id. at 616, 811.

[6] Arthroscopy is the "[e]ndoscopic examination of the interior of
a joint."  Id. at 161-62.  Bursal debridement is the "[e]xcision
of devitalized tissue and foreign matter from" the bursa.  Id.
at 496.

[7] Zoloft is "used to treat depressive, obsessive-compulsive, and
panic disorders . . . ."  Dorland's Illustrated Medical
Dictionary 1724, 2120 (31st ed. 2007).  Paxil is used to treat
these same disorders as well as various social anxiety
disorders.  Id. at 1405, 1419.

[8] Zyprexa is "used as an antipsychotic in the management of
schizophrenia and for short-term treatment of manic episodes in
bipolar disorder . . . ."  Id. at 1336, 2125.  Serzone and
Celexa are "used as an antidepressant . . . ."  See id. at 317,
372, 1255.  BuSpar and Ativan are used "in the treatment of
anxiety disorders and [for] short-term relief of anxiety
symptoms . . . ."  Id. at 174, 269, 1089-90.  Ativan is also

Marshall reported that these drugs were only temporarily effective in treating his depression and anxiety.  Tr. at 506.

In April 2003, Marshall began to receive treatment from psychiatrist Dr. Marc Sadowsky.  He informed Dr. Sadowsky that he had previously been diagnosed with attention deficit disorder ("ADD").  He noted that he had abused drugs and alcohol in the past but had been sober for seventeen years.  Among other issues, Marshall reported a decreased appetite, crying spells, decreased libido, anhedonia,[9] and episodes of euphoria accompanied by a sense that he could "do anything."  Dr. Sadowsky prescribed Effexor.[10]

Dr. Sadowsky treated Marshall approximately once every one to two months for the following ten years.  During this time Marshall alternated between reporting that things were "going well" and that he was a "tortured soul."  At various points, he described his mood as "improved," "somewhat better," "fairly stable," "down," "in a significant 'funk'" "variab[le]," "depressed," and "despondent."  He reported that his history of concussions, many accompanied by a loss of consciousness, had

---

used "as a sedative-hypnotic agent . . . ."  Id. at 174, 1089-90.

[9] Anhedonia is the "total loss of feeling of pleasure in acts that normally give pleasure."  Id. at 92.

[10] Effexor, a brand name for Venlafaxine, is "used as an antidepressant and antianxiety agent . . . ."  Id. at 2074.

contributed to mood variability and balance difficulties.  In
2003 Marshall reported "increasing anxiety" and irritability,
but by 2010 he denied significant difficulties with these
issues.  He reported suicidal ideation without a current plan or
intent in both 2003 and 2011 and reported stress due to an
unstable living situation between 2010 and 2012.  Marshall
reported in 2003 that his memory was "terrible," described it as
"variable" in 2010, and noted in 2012 that his memory had
improved since he began taking Huperzine A.[11]

Marshall noted at various office visits that his energy was
"increased," "decreased," and "okay"; that his concentration was
"decreased," "okay," and "variable"; and that he had "an
inability to focus" which was "improved," "decreased," and
"better" over time.  He reported "racing thoughts" on one
occasion.  Marshall frequently reported "significant" or
"episodic" sleep difficulties and "difficulty falling asleep and
mid-night awakening."  He stated that he had "not been sleeping
well," "did not sleep for four nights" on one occasion, took

---

[11] "Huperzine is . . . . prescribed in China for the
amelioration of memory loss, dementia, and cognitive function
disorders," see Ex Parte Weihong Xiong, No. 2009-014788, 2010 WL
4315364, at *1 (B.P.A.I. Oct. 29, 2010), but it is "not a
prescription medication" in the United States.  See Bayless v.
United States, 749 F.3d 1235, 1249 (10th Cir. 2014) (Hartz, J.,
concurring in part and dissenting in part).

Trazodone[12] as a sleep aid, but was sleeping better by 2011.  He also reported weight loss on at least two occasions.

Marshall initially reported that he was "not able to work on a regular basis," had "decreased" motivation, and was "having difficulties getting out of bed."  In contrast, between 2009 and 2012 Marshall consistently noted that he was "working on his used book business[] and doing some writing," which "seemed to be going fairly well for him" and "helped his demeanor."  By August 2012, Marshall reported improved self-esteem and noted that he was socializing.  Between 2011 and 2012, Marshall began taking Risperidone and Gabapentin,[13] which he reported to be "somewhat helpful" in addressing his headaches and neuropathy;[14] however, he periodically ran out of these and other medications due to financial hardship.

Dr. Sadowsky described Marshall's affect at various times as "anxious," "subdued," "calm," "euthymic," and "pressured"; his mood as "anxious," "improving," "okay," "variable . . .

---

[12] Trazodone is "used to treat major depressive episodes with or without prominent anxiety . . . ."  Dorland's, supra note 7, at 1983.

[13] Risperidone is "used as an antipsychotic agent . . . ."  Id. at 1674.  Gabapentin is "an anticonvulsant . . . used as adjunctive therapy in the treatment of partial seizures . . . ."  Id. at 764.

[14] Neuropathy is "[a] classic term for any disorder affecting any segment of the nervous system."  Stedman's, supra note 2, at 1313.

angry at times," "despondent," "depressed," "good," and "better"; his concentration and energy as "okay except when he is dealing with pain," "variable, depending on the amount of sleep," "fair," "better," "varied," and "decreased"; his motivation as "variable"; his sleep as "disturbed" and "variable with occasional mid-night awakening"; and his memory as "impaired," "normal," and "better."  Dr. Sadowsky noted Marshall's "very limited" stress reaction that may contribute to his difficulties focusing.  At various times, Dr. Sadowsky observed Marshall's irritability, racing thoughts, and pressured speech.  He noted on certain occasions that Marshall was either not suicidal or having fleeting thoughts of suicide.  Dr. Sadowsky filled out a Family Medical Leave Act form in 2007 in response to Marshall's reports that he could not work and recommended that he see a neurologist in 2012.  He also observed that Marshall was losing weight in 2012.

In June 2011, Dr. Sadowsky noted Marshall's diagnosis of major depressive disorder, recurrent episode, in partial or unspecified remission.[15]  He reported in October of that year that Marshall had "some decrease in attention," was "limited" in his ability to interact socially, and was "[n]ot on meds now"

---

[15] Major depressive disorder involves "either depressed mood or the loss of interest or pleasure in nearly all activities . . . ."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 163 (5th ed. 2013) [hereinafter DSM-V].

but had "responded fairly well" to treatment.  He also noted
that he was "unable to assess" Marshall's task performance and
was "unsure what he does for daily activities."

    4.  Dr. Quirbach

    Dr. Quirbach has been Marshall's PCP for over twenty years,
but the record primarily documents their treatment relationship
from 2009 to 2012 when Marshall visited Dr. Quirbach
approximately once a month.  In May 2009, Dr. Quirbach noted
that Marshall was doing well and had lost weight due to taking
Zyprexa.  He prescribed Ritalin[16] for Marshall's ADD, which he
and Marshall both described as "stable" and gradually improving.
Dr. Quirbach treated Marshall's migraine headaches and
photophobia[17] with Maxalt, Dilaudid, and therapeutic injections.[18]
Dilaudid, Percocet, Ibuprofen, Tylenol with Codeine, therapeutic
injections, and a prednisone taper[19] were used to treat

---

[16] Ritalin is "used in the treatment of attention-
deficit/hyperactivity disorder, narcolepsy, and certain forms of
depression . . . ."  Dorland's, supra note 7, at 1171, 1674.

[17] Photophobia is "abnormal visual intolerance of light."  Id. at
1461.

[18] Maxalt is "used in the acute treatment of migraine . . . ."
Id. at 1130, 1675.  Dilaudid, also known as hydromorphone
hydrochloride, is used "for the relief of moderate to severe
pain, as an antitussive, and as an adjunct to anesthesia."  Id.
at 527, 891.

[19] Percocet is "used as an analgesic . . . ."  Id. at 12, 1377,
1429.  Prednisone is used "as an antiinflammatory and immune-
suppressant in a wide variety of disorders."  Id. at 1531.

Marshall's various other ailments, including numbness and
weakness in the left arm and fingers resulting from left ulnar
neuropathy at the elbow; median neuropathy of the left wrist
consistent with carpal tunnel syndrome; left wrist joint
tenderness, swelling, and decreased range of motion; cervical
radiculopathy and sciatica causing spine tenderness, chronic
back pain, and pain radiating through the right hip, leg
shoulder, and arm; neck pain; and a right biceps tendon injury
that had been aggravated by a fall.[20]   Marshall also reported
"horrible" bilateral foot and ankle pain; x-rays indicated
calcaneal spurs, degenerative changes of the left first
metatarsophalangeal joint, incidental hammer toes, and
tenosynovitis for which Marshall received Dilaudid and Nubain.[21]

---

[20] Carpal tunnel syndrome involves "a complex of symptoms
resulting from compression of the median nerve in the carpal
tunnel, with pain and burning or tingling paresthesias [sic] in
the fingers and hand, sometimes extending to the elbow."  Id. at
1850.  Radiculopathy is a "disorder of the spinal nerve roots."
Stedman's, supra note 2, at 1622.  Sciatica is "[p]ain in the
lower back and hip radiating down the back of the thigh into the
leg . . . due to herniated lumbar disk compressing a nerve root
. . . ."  Id. at 1731.

[21] A calcaneal spur is "a bone excrescence on the lower surface
of the" heel bone "which frequently causes pain on walking."
Dorland's, supra note 7, at 273, 1783.  The metatarsophalangeal
joints pertain to "the part of the foot between the tarsus and
the toes . . . ."  Id. at 1162.  Hammer toe is "a condition in
which the proximal phalanx of a toe . . . is extended and the
more distal phalanges are flexed, causing a clawlike
appearance."  Id. at 1959.  Nubain is "used in the treatment of
moderate to severe pain and as an anesthesia adjunct . . . ."
Id. at 1249, 1312.

Marshall noted on two occasions that Dilaudid made him nauseous; Dr. Quirbach consequently recommended that he be evaluated by a methadone clinic rather than taking other long-acting narcotics that could potentially be abused.

Marshall reported at various times that he was "very optimistic that he is doing well," had "no complaints," was "doing better with his business," was continuing to write novels, hoped to travel, and did not require pain medication. At other times, Marshall informed Dr. Quirbach that it felt "like his hand is in a vice," likened the pain to a fractured wrist, and reported "almost unbearable" back pain making it difficult for him to sit.

Dr. Quirbach reported that Marshall had good motor strength in his left arm and a full range of motion of all joints in the extremities, but also noted limping, decreased range of motion and swelling of the spine, positive bilateral straight leg raises, and an episode of ataxia.[22]  On one occasion he observed left wrist swelling with significant pain and limited range of motion despite a normal x-ray.  On another occasion he reported tenderness and decreased range of motion in the left shoulder as a result of a "high riding proximal humerus worrisome for tear of the rotator cuff."  Dr. Quirbach suggested that Marshall's

---

[22] Ataxia is the "failure of muscular coordination; irregularity of muscle action."  Id. at 172.

cervical radiculopathy would require surgery, and an orthopedist diagnosed Marshall with left cubital tunnel syndrome[23] and recommended surgical release.

Marshall also reported short-term memory problems to Dr. Quirbach, who occasionally noted that Marshall was on edge, not himself, crying, anxious, hyperactive, and agitated.  In March 2013, Dr. Quirbach noted "increased anxiety related to [Marshall's] poor financial situation."  He ordered a brain MRI that, according to neurologist Dr. Deborah Berger, showed white matter lesions potentially consistent with early small vessel ischemia or a demyelinating disease such as multiple sclerosis.[24] Dr. Quirbach opined that the white matter lesions were consistent with Marshall's history of past drug abuse and head trauma, reported that he had organic brain syndrome,[25] and

---

[23] Cubital tunnel syndrome involves "a complex of symptoms resulting from injury or compression of the ulnar nerve at the elbow, with pain and numbness along the ulnar aspect of the hand and forearm, and weakness of the hand."  Id. at 1852.

[24] Ischemia is the "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel."  Id. at 975.  A demyelinating disease is "any condition characterized by destruction of the myelin sheaths of nerves."  Id. at 539.  Multiple sclerosis is "a disease in which there are foci of demyelination throughout the white matter of the central nervous system, sometimes extending into the gray matter; symptoms usually include weakness, incoordination, paresthesias [sic], speech disturbances, and visual complaints."  Id. at 1706.

[25] Organic brain syndrome involves "a constellation of behavioral or psychological signs and symptoms including problems with

recommended that Marshall participate in a head trauma study requiring donation of Marshall's brain to research following his death.  He later stated that Marshall's organic brain syndrome was "overall . . . better" and that Neurontin[26] and Risperidone appeared to be helping.

In July 2012 and February 2013, Dr. Quirbach opined that Marshall could lift and carry no more than ten pounds; could stand and/or walk less than two hours in an eight-hour day; could sit less than six hours in an eight-hour day; needed to periodically alternate sitting and standing; had diffuse pain, limited range of motion, and limited pushing and pulling abilities in both his upper and lower extremities due to weakness in his lower spine and a "dysfunctional" left arm; could never climb ramps, stairs, ladders, ropes, or scaffolds; could never balance or crawl; could occasionally kneel, crouch, stoop, reach, and handle; could frequently feel; had unlimited fingering abilities; could tolerate limited exposure to noise, dust, vibration, fumes, odors, chemical, and gases; needed to avoid humidity, wetness, extreme cold, and hazards such as heights; would need to be able to take unscheduled breaks to

attention, concentration, memory, confusion, anxiety, and depression caused by transient or permanent dysfunction of the brain."  Stedman's, supra note 2, at 1908.

[26] Neurontin is "an anticonvulsant that is . . . used as adjunctive therapy in the treatment of partial seizures . . . ." Dorland's, supra note 7, at 764, 1287.

relieve pain or discomfort; would be capable of gainful employment on a sustained basis only in a "very controlled environment"; and would be likely to be absent from work more than four times per month.  He also noted that Marshall had "episodic mood disorder" and "reduced intellectual functioning" due to multiple head traumas.  According to Dr. Quirbach, these impairments caused Marshall to have difficulty at least one third of the time in completing tasks and activities of daily living, tolerating stresses common to a work setting, working in coordination with or proximity to others without being distracted, adapting to changes in the work setting, and performing at a consistent pace.  He noted that Marshall would have difficulty maintaining attendance and a schedule most of the time and stated that Marshall experienced episodes of decompensation when under stress that lasted at least two weeks four or more times a year.  Dr. Quirbach opined that Marshall's mood swings and sleep problems would "make regular work impossible" and concluded that Marshall's functional limitations satisfied the SSA's definition of disability.

5.  Emergency Room Physicians

In September 2010, Marshall visited the emergency room for aggravated left hand and elbow pain.  The examining physician noted that Marshall had walked to the facility and appeared "quite anxious and uncomfortable due to the pain."  Some wasting

of the muscles of the left hand was observed, but finger and joint movement was normal.  The physician noted exacerbation of neuropathic pain of the left upper extremity due to ulnar nerve entrapment.  He prescribed Toradol[27] and Dilaudid.

In November 2011, Marshall returned to the emergency room reporting pain in his right foot after slipping on ice.  An x-ray showed no evidence of fracture.  The examining physician detected slight tenderness and swelling, assessed "right toe contusion versus neuralgia pain,"[28] and suggested a shot of Toradol.  He declined to refill Marshall's Dilaudid prescription and advised him to follow up with his regular doctors.

In November 2012, Marshall returned to the emergency room complaining of severe chronic pain due to neuropathies.  The examining physician observed that Marshall appeared very anxious, noted his past surgeries, chronic pain, hypertension, and generalized anxiety, and assessed chronic post-surgical pain and myofascial pain syndrome.[29]  He reported "recurrent pain with at least part of behavior attributed to drug seeking."  He

---

[27] Toradol is used "for short-term management of pain . . . ." Id. at 998, 1966.

[28] Neuralgia is "pain extending along the course of one or more nerves."  Id. at 1281.

[29] Myofascial pain syndrome, also known as fibromyalgia, "is a common nonarticular disorder of unknown cause characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissues."  The Merck Manual 321 (18th ed. 2006).

observed normal extremities with adequate strength and full range of motion despite moderate pain on palpation. The physician described a normal psychiatric evaluation with normal interpersonal interactions and appropriate affect and demeanor. He noted that Marshall had a pain contract and declined to prescribe any medication other than Tylenol.

   6.  Dr. Rescigno

   On November 10, 2011, Marshall visited neurologist Dr. John Rescigno for a neurological consultation. Marshall reported that he had suffered a number of seizures in 1994 due to head trauma and substance abuse. He noted more recent headaches, memory problems, distractibility, infrequent left/right confusion, chronic pain, and insomnia that was being treated ineffectively with Trazodone. Dr. Rescigno observed that Marshall was alert, fully oriented, and exhibited normal language, praxis, attention span, memory, fund of knowledge, strength, reflexes, sensation in all body regions, cerebellar presentation, and Romberg's test.[30] He also observed an antalgic gait and a postural tremor with no other involuntary movements.

   Dr. Rescigno concluded that the MRI findings were not relevant to Marshall's presentation and that his symptoms were not necessarily attributable to any particular disease. He

---

[30] Romberg's test is a neurological test in which "a patient, standing with feet approximated, becomes unsteady or much more unsteady with eyes closed." Stedman's, supra note 2, at 1771.

noted that the "modest abnormalities" on Marshall's brain MRI could represent cerebrovascular disease but were also consistent with a history of migraines.  He stated that it was "impossible to say" whether any of Marshall's symptoms were related to head injuries and that his memory problems appeared "more like difficulties with focus and concentration" and were "nonspecific for any one disease entity."  Dr. Rescigno opined that Marshall's poor sleep and tiredness during the day were consistent with his focus and memory problems.  He prescribed Neurontin and recommended that Marshall undergo further diagnostic imaging to monitor for future progression.

      7.  <u>Dr. Harriott</u>

In September 2011, consultative psychologist Dr. Evelyn Harriott examined Marshall.  Marshall denied hallucinations, delusions, misinterpretations, preoccupations, obsessions, phobic ideas, or current homicidal or suicidal ideation.  He reported irregular sleep patterns that prevented him from following a regular schedule, daily ten to fifteen minute long memory lapses, and weight loss due to stress.  He also reported a history of suicidal thoughts, but noted that his daughter and cat kept him going.  Marshall stated that he read, watched television, talked on the phone to booksellers and customers, prepared meals, walked or drove to town to buy groceries and perform errands, completed household chores, and cared for his

cat.  Marshall reported that he sometimes functioned at "100%" but at other times would "just hit a wall."

Dr. Harriott listed Marshall's diagnoses as attention deficit hyperactivity disorder, predominantly inattentive; bipolar disorder not otherwise specified; and cognitive disorder not otherwise specified.[31]  She described Marshall as cooperative, alert, oriented, "fidgety," anxious, and logical. She noted that Marshall had an appropriate affect, a normal rate and volume of speech, and was able to redirect himself after jumping from topic to topic.  He was able to satisfactorily complete several basic tasks on the Mini Mental Status Exam. Dr. Harriott opined that Marshall was able to independently perform daily activities on an inconsistent basis due to his reported memory interruptions; understand and remember simple instructions and information; attend, concentrate, and persist at an average pace to complete tasks; provide relevant information in addition to some extraneous information; make simple decisions; and interact appropriately with others.  She noted that it was "questionable" how often Marshall's memory lapsed as he had not shown any difficulty in the office.  She also noted that his ability to maintain attendance and a

_____

[31] Cognitive disorder not otherwise specified is a disorder "in which the primary clinical deficit is in cognitive function . . . that [is] acquired rather than developmental," but for "which the precise etiology cannot be determined . . . ."  DSM-V, supra note 15, at 591, 643.

schedule was "questionable" because he was not in the habit of doing so.  She opined that Marshall's depressive symptoms were likely to improve with treatment and described his prognosis with respect to memory as "questionable."

8.  Drs. Jamieson and Fairley

On November 3, 2011, non-examining state agency psychologist Dr. William Jamieson reviewed the available record and described Marshall's mental impairments as "organic mental disorder" and "affective disorders."[32]  He determined that these impairments imposed mild limitations on Marshall's activities of daily living; social functioning; and concentration, persistence, and pace, and had not resulted in any extended episodes of decompensation.  Dr. Jamieson concluded that the record did not indicate a severe mental impairment despite some evidence of "cognitive issues," "mood-related" symptoms, and functional limitation.

That same day, non-examining state agency physician Dr. Hugh Fairley reviewed the available evidence and determined that

_____

[32] An organic mental disorder involves "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain.  History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.02.  An affective disorder is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."  Id. § 12.04.

Marshall's severe physical impairments were "myoneural disorders" and "cerebral trauma."  He opined that Marshall could lift ten pounds frequently and twenty-five pounds occasionally; could sit, stand, or walk for a total of six hours in an eight-hour day; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; could never climb ladders, ropes, or scaffolds; and must avoid exposure to hazards and heights.  He explained that these limitations were due to Marshall's history of episodic sciatica and imbalance.  Dr. Fairley also opined that Marshall, who is right-handed, should avoid frequent fine manipulation with his left hand due to left carpal tunnel syndrome and ulnar neuropathy.

## C.   **Non-Medical Evidence**

### 1.   Function Reports

Marshall filled out a function report in July 2011, stating that on a typical day he ate breakfast, went for a walk, took care of his cat, wrote, tried to read, watched television, cooked for between fifteen minutes and two hours, and slept for periods no longer than forty-five minutes, which caused his schedule to be "basically non-existent."  He did laundry weekly, attended Alcoholics Anonymous meetings three to four times a week, saw friends occasionally, rarely vacuumed due to back pain, cleaned "whenever," traveled independently by walking or driving, and shopped for groceries when necessary.  He was

usually able to handle stress fairly well and got along fine
with authority figures.  In contrast, he was sometimes unable to
focus when reading or writing, tended to get confused by written
instructions, easily forgot spoken instructions, sometimes
forgot the next step while cooking, did not go out much, had
problems getting along with family members other than his
daughter, was unable to work due to "mobility/balance issues,
headaches, lack of focus, etc.," and often fell due to his brain
damage.  Marshall also reported that nerve damage to his left
hand limited "much physical stuff," that he frequently used a
cane and splint or brace on his left hand, and that he had
difficulty lifting things, climbing stairs, balancing,
remembering, and concentrating.

Around the same time, Marshall's adult daughter described
him as having "extreme issues with focus, balance, confusion and
depression."  She noted that he "forgets things and is easily
confused," "gets distracted," "never sleeps through the night,"
and often becomes "delerious [sic] from lack of sleep."  She
reported that he took longer "than it should" to do household
chores, needed reminders, and was unable to do yard work due to
balance issues that required him to use a cane, brace, or
splint.  She wrote that he had cared for her in the past, but
they had since undergone a role "reversal" where she was "the

parent who cares for him" and therefore spent four hours a day looking after him.

### 2.  Marshall's Hearing Testimony

Marshall was granted permission to stand during his testimony.  He stated that he had organic brain syndrome due to a history of nineteen concussions, many resulting in a loss of consciousness, that were incurred while playing hockey, boxing, and getting into fights in which he was hit with baseball bats and tire jacks.  He also noted that he had been diagnosed with degenerative cerebellum disease in 1986.  He testified that he frequently could not remember what he did the day or week before, could not place when events or conversations had happened, and did not have "time recall."  He stated that his "cerebellum sometimes doesn't work" and repeatedly told the ALJ that he had forgotten what he had just been talking about.

Marshall testified that he gets frequent migraines that are treated with a variety of medications, including Dilaudid.  Dilaudid was sometimes helpful, but it occasionally made him "loopy" or "fuzzy" such that he could not drive.  Marshall reported that his headaches had become more frequent since the "damage got worse in [his] brain" and he "started falling all the time" without warning.  He stated that he had decided to undergo a diagnostic study of his brain following an incident in which he kept falling down for four hours and was unable to

regain his balance or stand up. He noted that his balance had been suspect ever since this episode.

Marshall testified that he had a mood disorder "like . . . bipolar disease" in which he sometimes felt capable of functioning and sometimes went "into this abyss for two or three weeks at a time" and did not do anything. Marshall testified that he had thoughts of death but his daughter kept him from committing suicide. He testified that Dr. Sadowsky had taken him off anti-depressants when he was diagnosed with brain damage and that he had been "suicidal all the time until the meds started to work a little bit, mid-late last year." Marshall reported occasional confusion while completing simple tasks, causing him to start crying and "lose it" for twenty to twenty-five minutes. He described problems with anger and anxiety that affected his sleep and testified that migraine headaches, depression, confusion, and inability to focus had worsened to the point where he could not work, which he found embarrassing.

Marshall described issues with his elbow, right wrist, nerve damage, and associated chronic pain that had occurred for many years. He reported having undergone fourteen surgeries since 1988, including four shoulder surgeries, three lower back surgeries, and a left knee surgery. Marshall testified to worsening back pain since his last surgery and "really bad" sciatica in both legs extending down to his ankles because there

was a "hole in [his] spine." He could not sit, walk, or do anything other than lie down, sometimes felt "pins and needles," and often needed to put hot or cold packs on his back. Marshall also reported an impinged ulnar nerve in his left elbow, nerve damage in his left wrist and hand which caused "excruciating" pain, and two torn tendons in his left rotator cuff. Marshall testified that he had been told that he had a fifty percent chance of repairing the damage in his left hand. He had to wear a glove with a heating pad because he could not let his hand get cold. Marshall added that he has right hip pain, chest and neck pain due to arthritis, injuries to his sternum, hyperinsulinism[33] that causes his blood sugar to drop quickly, pain in his feet, a birth defect involving his heart, and right arm problems. He noted that he was on Neurontin and Risperidone and was taking Dilaudid because his brain damage and memory loss prevented him from taking certain other pain medications.

Marshall testified that his typical day depended on his previous day and night's sleep. He was currently living by himself but had recently been homeless, lived in his car, and lived with family and friends for periods when he was not able to care for himself. He could open a can of soup, feed his cat,

---

[33] Hyperinsulinism is "excessive secretion of insulin by the pancreatic islets . . . ." Dorland's, supra note 7, at 902.

watch television, listen to music, and volunteer with youth and local police departments.

Marshall noted that he had not done any housework in three years and had not completed any writing in two and a half years because he cannot concentrate.  He drove for two hours and ten minutes to attend the hearing but clarified that he could not drive all the time.  He testified that his wife had left in 2007 because she "didn't want to deal with [his] issues anymore."  He had not been able to work since he experienced a "psychotic break" in April 2009.

### 3.  VE's Hearing Testimony

The VE noted that Marshall had past jobs as a computer technician, retail salesperson, archive specialist/news librarian, book salesperson, and part-time writer, but Marshall clarified that he had earned no money in the latter two jobs. The VE testified that a hypothetical individual who could lift ten pounds frequently and twenty-five pounds occasionally; could sit, stand, or walk for a total of six hours each in an eight-hour day; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; could never climb ladders, ropes, or scaffolds; needed to avoid frequent fine manipulation with his left hand; and also needed to avoid all exposure to hazards and heights, could still perform the jobs of retail salesperson and news librarian.  The VE next testified that a

hypothetical individual with limitations similar to those above except that he could lift no more than ten pounds; could stand and/or walk for a total of two hours with an option to alternate sitting and standing; could push and pull only occasionally; could occasionally reach, handle, finger, and feel with his right upper extremity with no limitation in the left; and needed to limit his exposure to various environmental conditions, would not be able to perform any of Marshall's prior jobs but could work as a sorter, appointment clerk, or information clerk.  The VE clarified that her response was not based on the Dictionary of Occupational Titles, but rather on her own knowledge that these positions would permit an individual to work seated or standing with unlimited use of the left upper extremity. Marshall's attorney then asked the VE to assume a hypothetical individual with the physical functional limitations described by Dr. Quirbach.  The VE testified that these limitations would preclude all work, as typical employers will only tolerate up to one absence per month.

**D.    The ALJ's Decision**

In his decision dated April 19, 2013, the ALJ conducted the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4) to determine whether an individual is disabled. Tr. at 14-25.  At step one, the ALJ found that Marshall had not engaged in substantial gainful activity from his alleged onset

date, April 1, 2009, through his date last insured ("DLI"),
December 31, 2012.  At step two, he found that Marshall suffered
from the severe impairments of myoneural disorder and cerebral
trauma.  The ALJ concluded at step three that, through his DLI,
Marshall did not have an impairment or combination of
impairments that met or medically equaled the severity of one of
the listed impairments in 20 C.F.R. pt. 404, subpt. P, appx. 1.
The ALJ then found that Marshall had the residual functional
capacity ("RFC") to:

> perform light work as defined in 20 C.F.R.
> [§] 404.1567(b) except he could occasionally climb
> ramps and stairs, balance, stoop, kneel, crouch, and
> crawl.   He  could  never  climb  ladders,  ropes,  and
> scaffolds.    He   needed   to   avoid   frequent   fine
> manipulation  with  the  left  non-dominant  hand.    He
> needed  to  avoid  all  exposure  to  hazards,  including
> machinery and heights.

The ALJ found at step four that, prior to his DLI,
Marshall's RFC permitted him to perform past relevant work
as a retail salesperson and news librarian.  The ALJ thus
determined that Marshall had not been disabled as defined
in the Social Security Act during the relevant period.  Id.

## II. <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I must review the pleadings and
administrative record and enter a judgment affirming, modifying,
or reversing the final decision of the Commissioner.  My review

"is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.  The ALJ's findings of fact are accorded deference as long as they are supported by substantial evidence.  Id.  Substantial evidence to support factual findings exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Id. (quoting Rodriguez, 647 F.2d at 222).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Id. at 770 (citing Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam)).  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Irlanda Ortiz,

28

955 F.2d at 769; Da Rosa v. Sec'y of Health & Human Servs., 803
F.2d 24, 26 (1st Cir. 1986) (per curiam)).

### III.  <u>ANALYSIS</u>

Marshall maintains that the ALJ made numerous reversible
errors at steps three and four of the sequential evaluation
process.[34]  I consider each alleged error in turn.

### A.  <u>Step Three</u>

Marshall first claims that the ALJ did not adequately
evaluate his history of cerebral trauma because he failed to
consider its effects under listing 12.02, which concerns
"organic mental disorders."  <u>See</u> 20 C.F.R. pt. 404, subpt. P,
app. 1, § 12.02.  I disagree.  The listing for "cerebral
trauma," 11.18, states "[e]valuate under the provisions of 11.02
[convulsive epilepsy], 11.03 [nonconvulsive epilepsy], 11.04
[central nervous system vascular accident] and 12.02 [organic

---

[34] Marshall also contends that the ALJ erred at step two by (1)
failing to find that his affective disorder and attention
deficit disorder were severe impairments and (2) failing to
discuss a number of his physical impairments.  Assuming these
claims are true, "the ALJ found at least one severe impairment
and progressed to the next step of the sequential evaluation,"
rendering the errors harmless.  <u>See</u> McDonough v. U.S. Soc. Sec.
Admin., Acting Comm'r, 2014 DNH 142, 27 (citing Hines v. Astrue,
No. 11-CV-184-PB, 2012 WL 1394396, at *12-13 (D.N.H. Mar. 26,
2012), rep. & rec. adopted, Hines v. U.S. Soc. Sec. Comm'r, 2012
WL 1393063; Lawton v. Astrue, 2012 DNH 126, 17-19; SSR 85-28,
1985 WL 56856, at *3 (1985)).

mental disorders], as applicable."[35]  Even assuming that listing

12.02 is "applicable" to Marshall's history of cerebral trauma,[36]

the ALJ's RFC determination and step two findings conclusively

foreclose the possibility that Marshall's cerebral trauma, alone

or in combination with other impairments, meets or medically

equals the requirements of that listing.  Compare 20 C.F.R. pt.

404, subpt. P, app. 1, § 12.02(B-C) (among other requirements,

claimant must either (1) be markedly limited in activities of

daily living; social functioning; or concentration, persistence,

---

[35] Contrary to Marshall's view, the listings do not treat
cerebral trauma and organic mental disorder synonymously; it was
therefore not "contradictory" for the ALJ to conclude that the
former impairment imposed functional limitations whereas the
latter did not.  See Doc. No. 12-1.

[36] Cerebral trauma may or may not result in a mental disorder
covered under listing 12.02 that is marked by psychological or
behavioral abnormalities and associated mental limitations.  See
Cuthrell v. Astrue, 702 F.3d 1114, 1117 (8th Cir. 2013)
("[C]erebral trauma, or traumatic brain injury, can be either
neurological (11.02, 11.03, 11.04), mental (12.02), or both.").
An ALJ need not consult all four of the referenced listings if
the medical evidence of record indicates that one or more is
inapplicable to a claimant's particular impairment.  Pasco v.
Comm'r of Soc. Sec., 137 F. App'x 828, 844 (6th Cir. 2005); cf.
Selph v. Sec'y of Health & Human Servs., 872 F.2d 1028 (6th Cir.
1989) (unpublished table decision) (noting that the "as
applicable" language in listing 11.18 permits an ALJ to
disregard portions of any of the four referenced listings if
they are not relevant to the particular claimant's cerebral
trauma).  Here, the ALJ concluded that listing 11.04 was
"applicable" to Marshall's cerebral trauma and discussed its
provisions at step three.  Tr. at 20.  He did not err in failing
to consider listings 11.02 and 11.03, as no one contends that
Marshall has been diagnosed with epilepsy.  See Hill v. Astrue,
No. 12-cv-00089-JMS-DKL, 2013 WL 275673, at *10 (S.D. Ind. Jan.
24, 2013); Nosse v. Astrue, No. 08-CV-1173, 2009 WL 2986612, at
*12 n.24 (W.D. Pa. Sept. 17, 2009).

and pace, or (2) be subject to "more than a minimal limitation
of ability to do basic work activities" as a result of an
organic mental disorder), <u>with</u> Tr. at 17 ("[Marshall's] organic
mental disorder and affective disorder did not cause more than
minimal limitation in [his] ability to perform basic mental[37]
work activities . . . . [He] has no more than a mild limitation
in activities of daily living, social functioning, and
concentration, persistence, and pace.  He has experienced no
episodes of decompensation of extended duration."), <u>and</u> Tr. at
20 (ALJ's RFC determination noting no mental functional
limitations).  Moreover, the ALJ gave significant weight to Dr.
Fairley's opinion, which expressly states that he considered
listings 12.02, 12.04, and 11.12.  Tr. at 24, 76.  Any lack of
analysis in an ALJ's step three findings is harmless when he or
she reviewed an opinion on the question of equivalence signed by
a state agency medical consultant.  <u>See</u> Stratton v. Astrue, 987
F. Supp. 2d 135, 146 (D.N.H. 2012) (citing Phelps v. Astrue,
2011 DNH 107, 12-14); SSR 96-6P, 1996 WL 374180, at *3 (July 2,

---

[37] In some cases, a mental disorder may impose physical as well
as mental limitations.  See SSR 96-8P, 1996 WL 374184, at *6
(July 2, 1996) ("[E]ven though mental impairments usually affect
nonexertional functions, they may also limit exertional capacity
. . . ."). Marshall has not alleged that his mental impairments
- as opposed to his physical impairments - imposed any physical
limitations.

1996).  Consequently, any error committed by the ALJ here in failing to expressly mention listing 12.02 was harmless.[38]

Marshall next contends that the ALJ's step three findings - consisting of two sentences lacking any independent analysis or reference to the record - are unsupported by substantial evidence.  The ALJ's findings are essentially a verbatim recitation of listing 11.04 (which, as noted above, is incorporated by reference in listing 11.18):

> I have considered the claimant's reports of cerebral trauma and myoneural disorder within the context of listing 11.00 generally and 11.18.  His condition does not meet or equal the criteria required for a central nervous system vascular accident involving sensory or motor aphasia[39] resulting in ineffective speech or communication or significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait and station.

Tr. at 20.  Viewed in isolation, these findings would be insufficient.  See Stratton, 987 F. Supp. 2d at 145 (an ALJ must

---

[38] The same is true with respect to listing 12.04.  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B-C) (noting requirements identical to those in § 12.02(B-C)).

[39] Aphasia is "[i]mpaired or absent comprehension or production of, or communication by, speech, reading, writing, or signs, caused by an acquired lesion of the dominant cerebral hemisphere."  Stedman's, supra note 2, at 117.  Sensory aphasia involves "impairment in the comprehension of spoken and written words, associated with effortless, articulated, but paraphrastic speech and writing; malformed words, substitute words, and neologisms are characteristic."  Id.  Motor aphasia involves "a deficit in speech production or language output, often accompanied by a deficit in communicating by writing, signs, or other manifestation."  Id.

"reference specific evidence in the record to support his step three determination").  But "the focus must be on whether there exists substantial evidence in the decision as a whole for the step three determination."  Id. (quoting Fiske v. Astrue, No. 10-40059-TSH, 2012 WL 1065480, at *9-10 (D. Mass. Mar. 27, 2012)).  Elsewhere in his decision, the ALJ cited to medical records noting that Marshall had "decreased sensation and weakness in the [left] ulnar nerve distribution [but] was otherwise neurologically intact," Tr. at 21 (citing Tr. at 309), was "able to communicate using regular language. . . . [and] express himself clearly," Tr. at 19 (citing Tr. at 398, 400), and "exhibited normal language" during a neurological consultation, Tr. at 22 (citing Tr. at 794).  The ALJ noted that Marshall had "a mildly ataxic gait" on one occasion, Tr. at 22 (citing Tr. at 370), and that "[h]is gait was antalgic and he had a grade 1 postural tremor" on another occasion, Tr. at 22 (citing Tr. at 794), but he emphasized that "no other involuntary movements" were observed.  He also gave substantial weight to Dr. Fairley's determination "that multiple clinical examinations found no neurological deficits," and noted that Dr. Rescigno "did not feel that the abnormalities upon brain MRI were relevant to his presentation; he felt that the claimant's complaints either fluctuated or were much newer than any head injuries he sustained."  Tr. at 22, 24 (citing Tr. at 75, 318).

The ALJ concluded that "[t]hese treatment notes do not reflect functional deficits consistent with the claimant's allegations. . . . He . . . has a history of cerebral trauma, but does not consistently document neurological deficit."[40]  Tr. at 22. "Taking a broad approach, and considering the decision as a whole," see Stratton, 987 F. Supp. 2d at 146, I find the ALJ's step three conclusion to be supported by substantial evidence.

**B.  Step Four**

Marshall initially attacks the ALJ's step four determination on the grounds that it "contain[s] no analysis of the medical record related to 'myoneural disorder'" – an impairment that his "treating physicians did not diagnose him" with.  Doc. No. 12-1.  Marshall contends that "[i]t is entirely unclear how the administrative record supports the diagnosis of 'myoneural disorder'" or its "limiting effects" on his RFC.[41] Id.  I disagree.

---

[40] Although "[d]eterminations of equivalence must be based on medical evidence only and must be supported by medically acceptable clinical and laboratory diagnostic techniques," see Stratton, 987 F. Supp. 2d at 143 (quoting Phelps, 2011 DNH 107, 9-12), the ALJ's findings with respect to Marshall's activities of daily living further corroborate his step three determination.  See Tr. at 23-24 (Marshall "walk[s] daily for recreation," "run[s] errands either by driving or walking," and "has no problem with personal care, which involves standing and balancing to dress, standing to bathe, reaching for hair care, [and] fine manipulation for shaving and feeding").

[41] Even if this contention were true – which it is not - it is equally unclear how Marshall was prejudiced by the ALJ's

A myoneural disorder "[r]elat[es] to both muscle and nerve." Humecky v. Astrue, No. 07-CV-01010-TAG, 2009 WL 799178, at *12 & n.8 (E.D. Cal. Mar. 24, 2009) (quoting Stedman's, supra note 2, at 1274) (noting a state agency physician's use of the term to describe "pain in Plaintiff's neck, arms, hands, chest, knee and feet with sleeplessness"). Such disorders may be either specified[42] or unspecified.[43] No examining medical source used the term "myoneural disorder" to describe Marshall's

---

consideration of an impairment that he claims he does not have, as the error would only result in a more limiting RFC.

[42] Examples include myasthenia gravis, congenital and developmental myasthenia, and Lambert-Eaton syndrome. Ctrs. for Disease Control & Prevention, ICD-10-CM Tabular List of Diseases and Injuries §§ G70-G70.9, at 263 [hereinafter ICD], available at ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD10CM/2015/ICD10CM_FY2015_Full_PDF.zip (last visited July 23, 2014) (open PDF file entitled "FY15_Tabular").

[43] Marshall claims that, "[a]ccording to the International Classification of Diseases (ICD)[,] myoneural disorder is a chronic autoimmune neuromuscular disorder characterized by skeletal muscle weakness. . . . [I]t is caused by the blockage of the acetylcholine receptors at the neuromuscular junction." Doc. No. 12-1. But the ICD merely assigns codes to disorders and organizes them in a hierarchy; it does not define them. See, e.g., DSM-V, supra note 15, at xli. See generally ICD, supra note 42. Marshall's definition approximates the definition for myasthenia gravis, which is merely one example of a myoneural disorder. See Stedman's, supra note 2, at 1265 (myasthenia gravis is "a disorder of neuromuscular transmission marked by fluctuating weakness and fatigue of certain voluntary muscles, including those innervated by brainstem motor nuclei; caused by a marked reduction in the number of acetylcholine receptors in the postsynaptic membrane of the neuromuscular junction, resulting from an autoimmune mechanism"). Dr. Fairley expressly considered myasthenia gravis (listing 11.12) in relation to Marshall's impairments. Tr. at 76.

impairments, but Dr. Fairley did use the term, which was then repeated on Marshall's Disability Determination and Transmittal ("DDT") form.  See Tr. at 71, 75.  Both the ALJ and Dr. Fairley analyzed the medical evidence with respect to Marshall's diagnosed neuropathy and sciatica, see Tr. at 21 (citing Tr. at 275, 309, 316-17, 370), 24 (citing Tr. at 72-81), each of which "[r]elat[es] to both muscle and nerve."  See Stedman's, supra note 2, at 1274.  The ALJ made credibility determinations concerning symptoms related to these impairments, see Tr. at 22, and relied on medical opinions discussing the physical limitations imposed by them.  See Tr. at 24 (citing Tr. at 77-79) (summarizing Dr. Fairley's discussion of Marshall's "[h]istory of [e]pisodic [s]ciatica[,] episodic imbalance[,] . . . . CTS [carpal tunnel syndrome] & [u]lnar neuropathy").  Although a more explicit discussion of the term might have prevented confusion, the ALJ did not err in finding that Marshall has a myoneural disorder.

Marshall next argues that the ALJ did not adequately consider all of his medically determinable impairments at step four.  I disagree.  Throughout his decision,[44] the ALJ expressly

---

[44] The ALJ's analysis of the functional limitations relating to Marshall's mental impairments is found in the step two section of his decision rather than its expected placement in the step four section, but "the focus must be on whether there exists substantial evidence in the decision as a whole . . . ."  Cf. Stratton, 987 F. Supp. 2d at 145.

considered the medical evidence relating to the following
diagnoses made by Marshall's medical providers: ADD, see Tr. at
17 (citing Tr. at 344, 383, 885); major depressive disorder, see
id. (citing Tr. at 282-96); episodic mood disorder, see Tr. at
17-18, 23-24 (citing Tr. at 403, 566-72, 1179); ulnar neuropathy
at the left elbow and median neuropathy at the left wrist
consistent with carpal tunnel syndrome, see Tr. at 21, 24
(citing Tr. at 75, 78, 275, 309); sciatica, see id. (citing Tr.
at 75, 316-17); organic brain syndrome, see Tr. at 22-24 (citing
Tr. at 376, 1179); and tenosynovitis of the foot, see Tr. at 21
(citing Tr. at 320).[45]  Without expressly noting particular
diagnoses, the ALJ also discussed Marshall's "complaints of
generalized and localized pain," see id. (citing Tr. at 806-
963); "severe hand and back pain" and "lower lumbar spine
swelling and decreased range of motion," see Tr. at 22 (citing
Tr. at 331-35, 341, 344, 350, 357); "chronic right arm pain
related to a known right biceps tendon injury" and "right
shoulder joint tenderness and decreased range of motion," see
id. (citing Tr. at 360-61, 843, 849, 858, 874, 906); as well as

---

[45] The ALJ also stated that Marshall has cerebral trauma, organic
mental disorder, and affective disorder, but these are the
titles of listings in the Social Security regulations; they are
not independent diagnoses made by Marshall's medical providers.
See 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 11.18, 12.02, 12.04.

the effects of his neurological condition.[46]  See Tr. at 22, 24 (citing Tr. at 75, 298-99, 370, 375, 794).  The ALJ's review of the medical evidence of record was clearly sufficient.

Next, Marshall contends that the ALJ erred by not applying the SSA's special psychiatric technique to analyze his mental impairments.  See 20 C.F.R. § 404.1520a; SSR 96-8P, 1996 WL 374184, at *4.  Section 404.1520a requires an ALJ to rate the degree of functional limitation imposed by a claimant's mental impairments in the following categories: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  This technique must be applied at steps two and three of the sequential evaluation process, not at step four.  SSR 96-8P, 1996 WL 374184, at *4 (the technique "requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the 'paragraph B' and 'paragraph C' criteria of the adult mental disorders listings. . . .  [which] are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3").

---

[46] The decision does not indicate that the ALJ considered the degenerative changes to Marshall's feet, see Tr. at 1141-42, 62, but Marshall does not argue that this impairment imposed functional limitations greater than those prescribed in the ALJ's RFC.  Cf. Doc. No. 12-1 ("[I]t can be 'argued' that [the ALJ] adequately addressed Marshall's physical impairments at step 4 . . . .").

The ALJ permissibly found at step two that Marshall's mental impairments impose "no more than a mild limitation" with respect to activities of daily living; social functioning; and concentration, persistence, or pace. Tr. at 17. He found that Marshall "has experienced no episodes of decompensation of extended duration" and his "organic mental disorder and affective disorder did not cause more than minimal limitation in [his] ability to perform basic mental work activities." Id. Per § 404.1520a(e)(4), the decision "incorporate[d] the pertinent findings and conclusions," "show[ed] the significant history, including examination and laboratory findings, and the functional limitations that were considered," and "include[d] a specific finding as to the degree of limitation in each of the functional areas." See Tr. at 17-20.

The decision also indicates that the ALJ engaged in a "more detailed assessment" when crafting his RFC "by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings . . . ." See SSR 96-8P, 1996 WL 374184, at *4. Marshall claims that this "more detailed assessment" necessarily required the ALJ to select at least some of the mental limitations noted by his medical providers, but that is not the case. The ALJ gave moderate weight to Dr. Harriott's opinion - which does not note any mental functional limitations - because she "personally [met]

with and examine[d]" Marshall and "[h]er opinion is largely consistent with the narrative from the examination."[47]  Tr. at 19.  Dr. Harriott's opinion states that Marshall performs activities of daily living "inconsistently depending on his memory interruptions," but adds that "[i]t is questionable how often his memory lapses, as he did not evidence any difficulty in the office today" and "he is able to continue what he is doing" despite any memory difficulties.  Tr. at 400.  Dr. Harriott reported that Marshall's "ability to maintain attendance and a schedule are questionable," but only "because he is not in the habit of doing so."  Id.  The opinion notes that Marshall "is able to understand and remember simple instructions and information. . . .  [and] make simple decisions," but it does not state that Marshall is limited to these abilities.  Id.  The ALJ did not err in relying on Dr. Harriott's conclusions, Marshall's activities of daily living, and his presentation at office visits to conclude that he has no mental functional limitations affecting his ability to engage in work activity on a regular and continuing basis.  See 20 C.F.R. § 404.1545(c).

---

[47] The only opinion in the record to which the ALJ accorded more weight – Dr. Fairley's – also gives "increased weight" to Dr. Harriott's opinion.  Tr. at 76.  Without providing additional explanation, Dr. Fairley concluded that Marshall "does have . . . some functional limitations" related to his mental impairments that are at most mild.  Id.

Marshall also alleges that the ALJ ignored significant evidence from his daughter's function report,[48] his own function report,[49] and various treatment notes[50] that support his claim, while selectively relying upon isolated statements from these same documents that do not.  But as the Commissioner notes, "[a]n ALJ is not required to expressly refer to each document in the record, piece-by-piece."  Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557 (1st Cir. 1990) (unpublished table decision); accord Lord v. Apfel, 114 F. Supp. 2d 3, 13 (D.N.H. 2000) ("[A]n ALJ's failure to address a specific piece or pieces of evidence d[oes] not undermine the validity of her conclusion . . . when that conclusion was supported by citations to substantial medical evidence in the record and the unaddressed evidence was either cumulative of the evidence discussed by the

---

[48] Tr. at 220 ("extreme issues with focus, balance, confusion and depression"), 221 ("there has been "a 'roll [sic] reversal' where I am the parent who cares for him" and he has "problems sleeping, so sometimes sleeps into afternoon"), 225 ("writes less often"), 226 (attention varies "from hour to hour," gets "distracted," and "goes out less").

[49] Tr. at 230 ("unable to maintain any form of work"), 231 (does not "sleep well at all, so my schedule is basically non-existent"), 235 (attention "varies," "get[s] confused," "forget[s] very easily," and "rarely go[es] out or visit[s] people"), 236 ("us[es a] cane often").

[50] Tr. at 568 (noting that Marshall attempted to shoot himself after taking Ambien), 912 (noting that Marshall complained that Dilaudid made him nauseous).  Ambien is a "sedative-hypnotic administered orally in the short-term treatment of insomnia." Dorland's, supra note 7, at 58, 2120.

ALJ or otherwise failed to support the claimant's position."). Here, most of the unaddressed evidence that Marshall cites is cumulative of other evidence that the ALJ explicitly discussed[51] and the remaining evidence does not support Marshall's claim.[52]

Finally, Marshall contends that the ALJ erred by failing to give Dr. Quirbach's opinion controlling weight.  See SSR 96-8P, 1996 WL 374184, at *7 ("If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical

---

[51] See, e.g., Tr. at 17 (citing Tr. at 282) ("reported neurological difficulties"), 17-18 (citing Tr. at 403) ("described mood variability and periods of depression, despondence, and suicidal thoughts"), 18 (citing Tr. at 414-15, 566, 572) ("presented . . . with some decrease in . . . attention. . . .  Dr. Sadowsky . . . felt he had limited social interactions," "complained of continued decreased focus," and "presented with . . . decreased concentration [and] impaired short-term memory"), 22 (citing Tr. at 794) ("gait was antalgic and he had grade 1 postural tremor . . . .  complaints of poor focus and memory could be the result of poor sleep, which [Marshall] endorsed"), 23 (citing Tr. at 230, 234, 1179, 1174) ("complained of poor balance," "'sometimes' does not focus to read or write," "reduced intellectual functioning," and "Dr. Quirbach . . . stat[ed] that [Marshall] is disabled").

[52] First, Marshall had no recollection of the shooting attempt. Tr. at 568.  He immediately stopped using Ambien, turned his gun into the police, and notified his doctor and local pharmacies. Id.  Dr. Sadowsky recounted the incident and remarked that Marshall was not suicidal.  Id.  The incident thus appears to have been an isolated reaction to a drug that Marshall no longer uses.  Second, Marshall only reported that Dilaudid made him nauseous twice.  Tr. at 572, 912.  He subsequently avoided the drug, Tr. at 572, and reported no side effects other than that it is "[p]owerful. [I] never drive when taking," Tr. at 237, and "it just complete[ly] knocks me out or it makes me loopy.  I just get fuzzy.  But I won't drive."  Tr. at 51.  Marshall has not alleged that nausea affects his ability to work.

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight."); accord SSR 96-2P, 1996 WL 374188, at *2-3 (July 2, 1996); see also 20 C.F.R. § 404.1527(c)(2) (ALJ must give "good reasons" for the weight given to a treating source's opinion).  As Marshall notes, "[g]enerally, an ALJ should accord the greatest weight to the opinion of a claimant's treating source, less weight to an examining source, and the least weight to a non-examining source."  Chabot v. U.S. Soc. Sec. Admin., 2014 DNH 067, 27-29 (citing 20 C.F.R. § 404.1527).  Nevertheless, "an opinion from a treating source can be accorded little weight - less than that accorded a non-treating source - if the ALJ finds the opinion to be inconsistent with other substantial evidence in the record."  Id. (citing SSR 96-2p, 1996 WL 374188, at *2); accord Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 n.1 (1st Cir. 1988); Ferland v. Astrue, 2011 DNH 169, 10.

Here, the ALJ permissibly concluded that Dr. Quirbach's opinion was "not well supported by or consistent with the evidence of record," explaining that:

> [He] did not cite to physical findings that support [a] limitation [to sedentary work].  [Marshall] did not complain of difficulty with walking, standing, or lifting.  Neurological examinations did not document strength deficits.  He did not complain . . . of a need to alternate positions . . . .  Dr. Quirbach did not qualify the nature and degree of [Marshall's]

limitations in pushing and pulling. His limitation to
requiring unscheduled breaks . . . is not supported in
his treatment notes, as the claimant did not complain
of [this] need . . . . He was consistently able to
attend office visits; he goes to AA meetings
regularly. The record shows that he [can] maintain a
schedule. . . . [and] does not reflect . . . .
deterioration in functioning consistent with a
decompensation. Dr. Quirbach also . . . opin[ed] that
[Marshall] is disabled. This is an issue reserved to
the commissioner. . . . [Dr. Quirbach] is
[Marshall's] treating physician, but his opinion is
not consistent with his own treatment notes, which
principally recite [Marshall's] subjective reports . .
. or with . . . clinical examinations and reported
activities of the claimant.

Tr. at 24. This thorough assessment provides a number of "good
reasons" for the ALJ's decision to accord little weight to Dr.
Quirbach's opinion and indicates sufficient consideration of the
factors that must be evaluated before reaching that conclusion.[53]
See 20 C.F.R. § 404.1527(c)(2).

The ALJ was equally justified in according substantial
weight to Dr. Fairley's opinion, noting that:

Dr. Fairley did not . . . examine [Marshall], but he
did review the evidence of record. Additional
treatment notes were received . . . after . . . [t]his
review, but these treatment notes do not reflect
deterioration . . . .[54] He supported his opinion with

---

[53] These factors are: the length of the treatment relationship
and frequency of examination; the nature and extent of the
relationship; the extent to which medical signs and laboratory
findings, and the physician's explanation of them, support the
opinion; the consistency of the opinion with the record as a
whole; whether the treating physician is a specialist in the
field; and any other factors that tend to support or contradict
the opinion. 20 C.F.R. § 404.1527(c)(2-6).

[54] Although a "medical opinion may not be accorded significant

references to the evidence of record.  He noted . . .
a history of episodic sciatica and left carpal tunnel
syndrome and ulnar neuropathy.  Dr. Fairley opined
that the alleged severity of [Marshall's] impairments
was unexplained by the findings . . . .  He noted that
there was no relevant medical evidence regarding
severe head injuries and that multiple clinical
examinations found no neurological deficits.  Dr.
Fairley also noted [Marshall's] daily activities,
which involved walking daily for recreation.

Tr. at 24.  Again, this demonstrates sufficient consideration of

the factors enumerated in 20 C.F.R. § 404.1527(c)(2-6).[55]  The

ALJ determined that Dr. Fairley's opinion was more consistent

with the underlying medical findings than Dr. Quirbach's, and

"the resolution of [such] conflicts in the evidence and the

---

weight if it is based on a materially incomplete record[,] . . .
an ALJ is entitled to accord substantial weight to an RFC
opinion if the treatment notes postdating the medical source's
assessment are available to the ALJ and document the same
complaints of pain and clinical findings."  Chabot, 2014 DNH
067, 32-33 (citing Alcantara v. Astrue, 257 F. App'x 333, 334
(1st Cir. 2007) (per curiam); Wenzel v. Astrue, 2012 DNH 117,
11-12; Ferland, 2011 DNH 169, 11).  Marshall has not alleged
that the later treatment notes reflect deterioration in
Marshall's condition.  The ALJ reasonably concluded that they
did not.

[55] Marshall contends that Dr. Fairley "did not explicitly
indicate . . . what physical impairments or listings he
considered."  Doc. No. 12-1.  I disagree.  Dr. Fairley's opinion
expressly references "[n]erve damage," "[b]rain damage," "tbi
[traumatic brain injury]," "[p]ost [c]oncussion [s]yndrome,"
"[d]epression," "[c]ervical radiculopathy," "ulnar neuropathy,"
"CTS [carpal tunnel syndrome]," "[s]ciatica," "[m]yoneural
[d]isorders," "[o]rganic [m]ental [d]isorders [listing 12.02],"
"[a]ffective [d]isorders [listing 12.04]," "[c]erebral [t]rauma
[listing 11.18]," and "[m]yasthenia [g]ravis [listing 11.12]."
Tr. at 72, 75-76.  Marshall also alleges that Dr. Fairley did
not "explicitly provide any explanation" for his conclusions.
Doc. No. 12-1.  Again, I disagree.  Dr. Fairley's explanations,
although brief, were sufficient to support his conclusions.

drawing of conclusions from such evidence are for the [ALJ],"
not the courts.[56]  Irlanda Ortiz, 955 F.2d at 769 (citing
Rodriguez, 647 F.2d at 222).


## IV.  CONCLUSION

For the reasons discussed above, I deny Marshall's motion
to reverse, Doc. No. 12, and grant the Commissioner's motion to
affirm.  Doc. No. 14.  The clerk is directed to enter judgment
accordingly and close the case.

---

[56] Marshall also argues that the "administrative record does not
reveal Dr. Fairley's medical credentials" and that his opinion
was "authored by multiple persons," including an "unknown author
[who] cryptically summarized some medical information," and thus
it is "unclear who authored what."  Doc. No. 12-1.  These claims
lack merit.  First, Dr. Fairley's name appears on the DDT form,
see Tr. at 71, which notes that he is a physician ("MD") with a
specialty code of 19, denoting internal medicine.  See Program
Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec.
Admin. (Oct. 25, 2011), https://secure.ssa.gov/apps10/poms.nsf/
lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug.
29, 2012), https://secure.ssa.gov/apps10/poms.nsf/lnx/
0426510090.  Second, Dr. Fairley electronically signed and dated
his opinion – a Disability Determination Explanation form – at
the end of the RFC section and again on the form's final page.
Tr. at 79, 81.  Dr. Jamieson did sign below the Psychiatric
Review Technique section, see Tr. at 76, but the "[c]ase [was]
reviewed" by Dr. Fairley after Dr. Jamieson documented his
conclusions and prior to Dr. Fairley signing on the final page,
below the ultimate determination that Marshall is "[n]ot
[d]isabled."  See Tr. at 81, 421.  In his RFC analysis, Dr.
Fairley also cited to another section of the form containing
findings relating to both physical and mental impairments.  See
Tr. at 78 (citing Tr. at 75).  To the extent the ALJ relied on
Dr. Fairley's opinion with respect to Marshall's mental
impairments - if at all - I am persuaded that Dr. Fairley
drafted or adopted all of the conclusions contained in the form.

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

August 27, 2014

cc:   Janine Gawryl, Esq.
      Robert J. Rabuck, Esq.